## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**CARLTON BAKER,**

      **Plaintiff,**

**vs.**                             **Case No.  5:15cv201-MP/CAS**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social**
**Security Administration,**

      **Defendant.**

_____/

## <u>REPORT AND RECOMMENDATION</u>

This is a Social Security case referred to the undersigned magistrate

judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C.

§ 405(g) for review of the final determination of the Acting Commissioner

(Commissioner) of the Social Security Administration (SSA) denying

Plaintiff's application for a period of disability and Disability Insurance

Benefits (DIB) filed pursuant to Title II of the Social Security Act (Act) and

an application for Supplemental Security Income (SSI) filed pursuant to

Title XVI of the Act.  After consideration of the entire record, it is

recommended that the decision of the Commissioner be reversed and remanded for further proceedings.

## I. Procedural History

On April 26, 2012, Plaintiff, Carlton Baker, filed applications for DIB and SSI alleging disability beginning May 1, 2010, based on problems with back and neck pain and depression.  Tr. 21, 43, 154, 223-33, 255-56, 260, 263, 283.  (Citations to the Transcript/Administrative Record, ECF No. 12, shall be by the symbol "Tr." followed by a page number that appears in the lower right corner.)  At the administrative hearing, Plaintiff, with the advice of his attorney, amended his alleged onset date to March 30, 2012, which corresponded with a cervical MRI dated March 30, 2012, Tr. 333-34. Tr. 21.  Plaintiff's date last insured for DIB is March 31, 2014.  Tr. 21, 256.

Plaintiff's applications were denied initially on June 1, 2012, and upon reconsideration on July 6, 2012.  Tr. 21, 76-142, 146-61.  On August 3, 2012, Plaintiff requested a hearing.  Tr. 21, 160-61.  On December 16, 2013, Administrative Law Judge (ALJ) Jeffrey Marvel held a hearing in Tallahassee, Florida.  Tr. 21, 39-75.  Plaintiff was represented by Thomas Furr, an attorney.  Tr. 21, 143-45.  Plaintiff testified during the hearing. Tr. 21, 46-66.  Ronnie C. Mayne, an impartial vocational expert (VE), testified during the hearing.  Tr. 21, 66-75, 221-22 (Resume).

On January 31, 2014, the ALJ issued a decision and denied Plaintiff's applications for benefits concluding that Plaintiff was not disabled from March 30, 2012, through the date of the decision.  Tr. 21-34.  On February 14, 2014, Plaintiff requested review of the ALJ's decision.  Tr. 15-17. Counsel submitted additional medical evidence from the Department of Veterans Affairs for July 26, 2013, through November 13, 2014.  Tr. 7, 14, 556-735 (Exhibit 12F).  On June 5, 2015, the Appeals Council considered the submitted evidence and denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-9; *see* 20 C.F.R. § 404.981.

On August 9, 2015, Plaintiff filed a Complaint with this Court seeking review of the ALJ's decision.  ECF No. 1.  The parties filed memoranda of law, ECF Nos. 18 and 19, which have been considered.

## II.  Findings of the ALJ

The ALJ made several findings:

1. "The claimant has not engaged in substantial gainful activity since March 30, 2012, the amended onset date."  Tr. 23.

2. "The claimant has the following severe impairments: degenerative disc disease of the cervical spine, status-post fusion; degenerative disc disease of the lumbar spine; carpal tunnel syndrome of the left wrist; and acromioclavicular osteoarthritis."  *Id.*  The ALJ considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listings of Impairments and determined Plaintiff had *no*

restriction in activities of daily activities, *mild* difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, and *no* episodes of decompensation, each of extended duration.  Tr. 24-26.

3. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  Tr. 27.

4. "[T]he claimant has the residual functional capacity [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), such that he can occasionally lift 10 pounds and frequently lift 5 pounds.  He can stand and/or walk 6-hours in an 8-hour workday and sit for 6-hours in an 8-hour workday.  He can occasionally climb ramps, stairs, balance, kneel, crouch, stoop, and/or crawl.  He cannot climb ladders, ropes, or scaffolds.  He can frequently reach with his left upper extremity.  He can frequently handle and finger with his left hand.  He should avoid concentrated exposure to vibrations."  Tr. 27.  The ALJ ultimately determined that Plaintiff could "perform a reduced range of light work."  Tr. 32.

5. "The claimant is unable to perform any past relevant work." Tr. 32.

6. "The claimant was born [i]n 1963[,] and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age."  *Id*.

7. "The claimant has at least a high school education and is able to communicate in English."  *Id*.

8. "Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform."  Tr. 33.  The ALJ determined based on the VE's testimony that the hypothetical individual would be able to perform the requirements of several

representative occupations including house sitter, mail sorter, and ticket clerk, all light exertion and unskilled with an SVP of 2.[1]
Tr. 33.

9. "The claimant has not been under a disability, as defined in the Social Security Act, from March 30, 2012, through the date of" the ALJ's decision.  Tr. 34.

## III.  Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The

---

[1] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 404.1568(a).  A Specific Vocational Preparation (SVP) of two means "[a]nything beyond short demonstration up to and including 1 month."  Dictionary of Occupational Titles (DOT) (4th ed., rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP. "[SVP] is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  Id.  Unskilled work corresponds to an SVP of one and two.  Social Security Ruling (SSR) 00-4p, 2000 SSR LEXIS 8, at *8 (Dec. 4, 2000).  Further, unskilled work is work involving understanding, remembering, and carrying out simple instructions; making simple work-related decision; dealing with changes in a routine work setting; and responding appropriately to supervision, co-workers, and usual work situations.  SSR 85-15, 1985 SSR LEXIS 20, at *10-11 (1985).  In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted). The court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision. Moore, 405 F.3d at 1211.[2]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but

---

[2] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).[3]  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212 (2002).  In addition, an individual is entitled to DIB if he is under a disability prior to the expiration of his insured status.  *See* 42 U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

1. Is the individual currently engaged in substantial gainful activity?

---

[3] The relevant DIB and SSI regulations are virtually identical.  As a result, citations will be made to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599, unless a SSI regulation provides otherwise.  The parallel regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB citations, e.g., 20 C.F.R. § 404.1563(c) corresponds to 20 C.F.R. § 416.963(c).

2.  Does the individual have any severe impairments?

3.  Does the individual have any severe impairments that meet
    or equal those listed in Appendix 1 of 20 C.F.R. Part 404,
    Subpart P?

4.  Does the individual have the RFC to perform work despite
    limitations and are there any impairments which prevent
    past relevant work?[4]

5.  Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in

disapproval of the application for benefits.  A positive finding at step three

results in approval of the application for benefits.  At step four, the claimant

bears the burden of establishing a severe impairment that precludes the

performance of past relevant work.  Consideration is given to the

assessment of the claimant's RFC and the claimant's past relevant work.  If

the claimant can still do past relevant work, there will be a finding that the

---

[4]  An RFC is the most a claimant can still do despite limitations.  20 C.F.R.
§ 404.1545(a)(1).  It is an assessment based upon all of the relevant evidence including
the claimant's description of her limitations, observations by treating and examining
physicians or other persons, and medical records.  *Id.*  The responsibility for
determining claimant's RFC lies with the ALJ.  20 C.F.R. § 404.1546(c); *see* Social
Security Ruling (SSR) 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) ("The term
"*residual functional capacity assessment"* describes an adjudicator's finding about the
ability of an individual to perform work-related activities.  The assessment is based upon
consideration of all relevant evidence in the case record, including medical evidence
and relevant nonmedical evidence, such as observations of lay witnesses of an
individual's apparent symptomatology, an individual's own statement of what he or she
is able or unable to do, and many other factors that could help the adjudicator determine
the most reasonable findings in light of all the evidence.").

claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g). An ALJ may make this determination either by applying the grids or by obtaining the testimony of a vocational expert.  Phillips, 357 F.3d at 1239-40; *see* 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.  The Evidence

### A.  Relevant Medical Evidence

*Florida Department of Health*

Plaintiff established care with the Department of Health on October 27, 2011, and he received treatment in October and November 2011 due to lower back pain that was present for years, but had recently worsened. Tr. 311-13.  He reported left-sided numbness extending into his calf,

intermittent tingling, and increased pain with lying down and standing for extended periods.  Tr. 311.   Plaintiff was prescribed Naprosyn and Flexeril, which helped with pain, but not the numbness.  Tr. 311-12.  The ALJ referred to Plaintiff's treatment at the health department.  Tr. 29.

*Joseph C. Siano, D.O., Consultative Examiner*

On December 3, 2011, Plaintiff was examined by Dr. Siano at the Commissioner's request.  Tr. 324-29.  Plaintiff reported pain and limitations due to back pain, a perforated right ear drum and some dizziness, imbalance, and anxiety, resulting in the ability to stand up to 15 minutes, walk 15-20 minutes if his balance is good, sit for 10-15 minutes before he has to change position, drives locally, and lift a gallon of milk.  He can dress himself and perform household chores.  His last job was in 2010 as a landscaper.  Tr. 324.  Dr. Siano confirmed the perforated ear drum, but noted that Plaintiff does not receive any treatment for his ear condition.  He noted no other abnormalities.  Tr. 325-26.  Plaintiff was in no acute distress; he was alert and cooperative.  Tr. 326.  Plaintiff could get on and off the table and in and out of a chair easily.  His gait was normal and unassisted and he ambulated well without any balancing problems in the clinic.  *Id.*  He had normal mentation and was able to answer questions and follow commands.  His motor strength was 5/5 in the upper and lower

extremities and he had normal sensory system intact to touch.  He was able to squat, walk on heels, walk on toes, and to perform heal-to-toe maneuvers.  He had a negative Romberg and deep tendon reflexes were 2+ throughout.  *Id.*  Dr. Siano opined that the impairments posed "no functional limitation at this time."  Tr. 327.

The ALJ referred to Dr. Siano's examination report and stated that he found Plaintiff "somewhat more limited" than Dr. Siano and gave "his assessment only some weight."  The ALJ states that he fully accounted for Dr. Siano's suggested limitations that are supported by the record informing plaintiff's RFC by generally stating as "[d]etail above and below."  Tr. 29.  The ALJ does not expressly state how he fully accounted for Dr. Siano suggested limitations.  *Id.*

*Tallahassee Orthopedic Clinic (TOC)*[5]

On March 22, 2012, Plaintiff first saw Thomas M. Park, M.D., after referral by Vocational Rehabilitation services for evaluation of back and neck problems Plaintiff had since he was in the Navy in 1985.  Tr. 339.

---

[5]  In three paragraphs, the ALJ refers to treatment notes provided by physicians at TOC between March 2012 and September 2013.  Tr. 29.  The ALJ does not explain whether he accounted for the opinions of these physicians and their patient notes when assessing Plaintiff's RFC.  None of the physicians or healthcare providers at TOC opined regarding Plaintiff's ability to function in the workplace, although the ALJ noted "that physicians consistently characterized the claimant spinal conditions as mild to moderate when relating to claimant's MRI results."  Tr. 29 (citations omitted).

Plaintiff reported longstanding back and neck problems which had worsened until he was experiencing pain levels of 10 out of 10. *Id*. His neck pain radiated from the shoulder to the hand, resulting in left arm weakness with the inability to lift his arm up to a horizontal level. *Id.* He also had left lumbar flank pain radiating into the left leg to the ankle. *Id.* Upon examination, Dr. Park noted Plaintiff's cervical spine was mildly tender upon palpation with diminished flexion and extension. Spurling test was negative as was Lhermitte's; there was no obvious instability; and paraspinals were strong. *Id*. Thoracolumbar spinal exam revealed mild palpable tenderness. *Id.* Upper extremities were both examined and Dr. Park confirmed that Plaintiff showed an inability to abduct his arm, only to a maximum of 70° before he began scapular assistance on abducting the shoulder. Tr. 340. He was unable to maintain a completely horizontal position with the arm, cuff strength was 3/5, and there "does appear to [be] some atrophy around the left shoulder joint" with 4+ weakness of the left finger extensors. *Id*. The sensory exam indicated hypoesthesia of the left arm and hand globally. *Id.* Dr. Park's impressions included left neck pain and suspected myofascial and possible reactive to left cervical radiculopathy; possible left cervical radiculopathy; suspect left rotator cuff tear; left lower back pain with left

lateral sciatica, possibly lumbar radiculopathy; tobacco use; history of weight loss.  Tr. 340.  Dr. Park recommended his return to the clinic for another appointment regarding the suspected rotator cuff tear of the left shoulder.  Tr. 341.

X-rays showed "moderately severe spondylosis throughout most of the cervical anatomy from C3 down to T1.  There is multilevel loss of disc height, worse at C6-7, multilevel posterior bar osteophyte seen from C4 down to C7.  Lordosis is lost and there is some kyphotic angulation that is minimal at C4-5."  Tr. 342.  For the lumbar spine, there was "mild degenerative disc disease" with mild degeneration of the hip and SI joints. *Id.* Further studies were ordered.  Tr. 340.

On April 12, 2012, Dr. Park re-evaluated Plaintiff and reviewed both the images and the reports from March 30, 2012, MRIs of the cervical and lumbar spine.  Tr. 330-36.  Plaintiff reported that his symptoms remained "essentially the same as before, although more severe." Tr. 330.  At that time, his pain was a level of 5 out of 10, but "twisting, lifting, lying down, bending, and sitting are all problematic."  *Id.*  Dr. Park also noted that Plaintiff continued to have "forward posturing of the head in relationship to the shoulders and limited flexion-extension."  *Id.*  The

straight leg raise was positive on the left.[6]  *Id.*

Dr. Park noted that he reviewed the cervical MRI report and original

images:

> It [the MRI] was read as showing multilevel degenerative
> spondylosis with a left greater than right foraminal stenosis at
> C3-4 due to a left paracentral and left proximal foraminal disc
> osteophyte complex.
>
> At C4-5, there is a moderate-to-severe foraminal stenosis on
> the left with severe stenosis of the right foramen.
>
> At C5-6, there is moderate right-sided and moderate-to-
> severe left sided foraminal stenosis, and at C6-7 there is
> moderate-to-severe right-sided foraminal stenosis with severe
> left foraminal stenosis.  There are also described Modic-type
> endplate changes.  Marrow and cord signal were considered to
> be unremarkable.
>
> I have reviewed the above images and would concur… I
> would add there is significant loss of disc height throughout
> the mid cervical levels described above.

Tr. 330-31.  Dr. Park reviewed the lumbar MRI report noting:

> It was read by the radiologist as showing a right L4-5
> annular tear with a broad-based disc bulge at L5-S1.  There
> was a minimal left paracentral protrusion resulting in left

---

[6] "Between April 2012 and October [sic] 2012, Horacio Rodriguez[-Jimenez,
M.D.], a treating physician [from Family Care Center in Panama City, Florida] indicated
the claimant subjectively reported experiencing pain and intermittent numbness in his
lower back (Exhibit 11F)."  Tr. 30.  In addition to reporting back pain, Plaintiff also
reported neck and shoulder pain.  Tr. 544-45, 547-49, 555.  The patient notes are
difficult to read.  Tr. 544-50.  An April 30, 2012, x-ray of Plaintiff's left shoulder showed
no fracture, dislocation, or acromioclavicular joint separation was detected.  Tr. 554.
The radiologist's opinion was: "The possibility of cervical radiculopathy may be a
consideration, but no osseous abnormality of the shoulder is identified."  *Id.*  The ALJ
referred in one sentence to Dr. Rodriguez' treatment of Plaintiff.  Tr. 30.

greater than right foraminal stenosis and left paracentral disc protrusion causing "crowding of the S1 nerve root" on the left.

I have reviewed above images and concur with [the] radiologist's report.  I suspect that neural compress is created at L5 on the left at L5-S1.

Tr. 331.  Dr. Park diagnosed chronic neck pain and left arm pain, possibly due to multilevel severe foraminal stenosis, left and cervical spondylosis, and lower back pain with left lateral sciatica, possibly due to L5 radiculopathy secondary to L5-S1 foraminal stenosis, and tobacco abuse.  *Id.*  Dr. Park recommended surgical intervention for the neck pain.  *Id.*  Dr. Park further explained that, "[i]n regards to his lower back and left leg pain, I have advised him that this is from the neurocompressive lesion at the L5-S1 on the left."  *Id.*  Plaintiff opted for an epidural injection, but Dr. Park noted that he was also a candidate for surgical intervention for the lumbar back pain and symptoms.  *Id.*

On May 17, 2012, Plaintiff reported to Dr. Park of TOC having "significant difficulty sleeping where he has to get up multiple times during the night and walk around due to the pain.  He also has pain radiating into the left shoulder and weakness in his arms."  Tr. 541. Upon examination, Dr. Park noted that Plaintiff's "[e]xtension is severely limited with pain radiating into his left shoulder and arm.  His forward flexion is moderately limited with neck pain only.  Upper extremity

strength shows his left deltoid is 3/5. Left finger extensors are 4/5….

Sensation is somewhat diminished in the C5 dermatome on the left.

Spurling maneuver is positive on the left and mildly positive on the right"

with a questionable Hoffmann's sign on the right and negative on the left.

*Id.* Dr. Park ordered further studies (an MRI) of the left shoulder and

noted that Plaintiff had to see a dentist to get his teeth removed, but more

than likely would need a cervical fusion and decompression. *Id.*

On May 24, 2012, it appears Mel Gaston, P.A.-C., with Dr. Park at

TOC, *see* Tr. 541, completed a Treating Source Orthopedic

Questionnaire at the Commissioner's request. Tr. 344-45. Mr. Gaston

noted that Plaintiff was diagnosed with radiculopathy with related

symptoms of chronic pain, limited range of motion of the left shoulder and

neck, decreased grip strength (4 out of 5), and decreased ability to

perform fine manipulation, but still able to perform fine and gross

manipulation on a sustained basis. Tr. 345.

A June 15, 2012, left shoulder MRI indicated, in part, mild to

moderate areas of focal edema, consistent with a strain/mild partial tear;

mild tendinopathy of the infraspinatus without significant tear; and

acromioclavicular osteoarthritis and mild to moderate likely reactive bursal

fluid. Tr. 524. Plaintiff also underwent an electrodiagnostic study of the

upper extremities on June 29, 2012, which was deemed abnormal.
Tr. 522-23.  The EMG study indicated bilateral C6 radiculopathy; right
moderate demyelinating ulnar neuropathy at the cubital tunnel; and
evidence of a left mild incomplete median neuropathy at the wrist
consistent with carpal tunnel syndrome.  Tr. 523.

On November 15, 2012, Plaintiff was seen by Dr. Park complaining
of left arm pain with burning, numbness, and tingling and neck pain.
Tr. 536.   He was able to walk without limitation, stand without limitation,
and sit up for 5-30 minutes.  Upon examination of his cervical spine,
Plaintiff continued to have "severely limited" extension of the cervical
spine, with pain radiating into the left shoulder and arm; "moderately
limited" forward flexion with neck pain only; reduced upper extremity (left
deltoid, biceps, and wrist) strength, but the remainder of his strength is
otherwise normal; and somewhat diminished sensation in the C5 and 6
dermatomes on the left; Spurling maneuver is positive on the left and
mildly positive on the right; negative Hoffmans and Lhermitts.  Tr. 537.
Cervical spine fusion was anticipated.  *Id.*  From a psychiatric review of
systems, Plaintiff admitted to feelings of anxiety, but denied any depressed
feeling and hearing voices.  Tr. 536.  Plaintiff's condition remained
unchanged at the March 7, 2013, pre-surgical review.  Tr. 533-34.

On March 13, 2013, Dr. Park performed an anterior cervical discectomy and fusion of the cervical spine at C4-C5, C5-C6, and C6-C7 with instrumentation due to cervical degenerative disc disease with radiculopathy at C4-C5, C5-C6, and C6-C7.[7]  Tr. 517; *see* Tr. 455 (VA patient note).  Dr. Park noted that the disc level were severely sclerosed, worse at the C5-C6 level.  Tr. 517-18.  At the March 26, 2013, postsurgical checkup, Plaintiff was noted to have decreased strength throughout the left hand (4/5) with intrinsic atrophy, and a positive Tinel's and Phalen's test at the right wrist and elbow.  Tr. 531.

On August 8, 2013, Plaintiff informed Dr. Park that he was worse since the last visit, with "constant" and "moderate to severe" pain of 7/10 despite Percocet, Norco, and Tramadol.  Tr. 526.  Upon a bilateral cervical spine examination, Dr. Park noted that Plaintiff's range of motion was moderately limited with discomfort, but his gait and station were normal. The remainder of the musculoskeletal exam did not reveal any significant abnormalities. *Id.*  Plaintiff's fusion was deemed to be solid, and physical therapy was prescribed.  Tr. 527.  Norco was prescribed and Plaintiff was instructed to follow up with his primary care provider.  *Id.*  It appears that this was Plaintiff's last visit with Dr. Park and TOC.  *See*

---

[7]  Dr. Ward examined Plaintiff on March 4, 2013.  Tr. 368; *see infra* at 21-24.

Tr. 63.

On August 14, 2013,  Plaintiff was also evaluated for post-surgical physical therapy services through Jackson Hospital.  Tr. 516.  His current pain level was 6, with a best of 4 and worst of 10+, and he complained of "'locking' severe pain."   *Id.*  He was noted to have "limited [activities of daily living secondary] to neck pain and left upper extremity weakness."  Rehabilitation potential was rated as fair.  *Id*.

*Julian A. Salinas, Ph.D., Consultative Examiner*

At the Commissioner's request, on May 29, 2012, Plaintiff was referred to Dr. Salinas for a general clinical evaluation with mental status. Plaintiff was alleging disability due to "neck problems."  Tr. 348-52. Dr. Salinas provided a detailed history.  Tr. 348-49.  The mental status examination revealed the following:

> Mr. Baker was oriented to time, place, person, and circumstances. He spoke logically and coherently adopting adequate rate and volume of speech.  Content of his speech was consistent with his reported education and below-average intellectual functioning.  He expressed no bizarre ideas and he did not appear to respond to unseen stimuli.  He denied hallucinations.  In responding to questions, she provided relevant and appropriately elaborated answers.  He was able to recount life events adequately and had some difficulty estimating their chronology.  He stated that he has problems with concentration.  He accurately completed 3 of 5 iterations of serial 7's subtraction in 52 seconds.  He stated that he has problems with his memory for recent events and variable memory for remote events.  He repeated a list of three unrelated objects and he recalled all three following a brief delay with a distractive task.  He

stated that his mood the past two weeks has been "all of the above." His affect was broad in range and mildly depressed in content. He denied suicidal or homicidal ideation. He stated that his sleep is disrupted by pain and discomfort and that his appetite was variable. He appeared to be under nourished.

Tr. 350.  Plaintiff appeared capable of managing his own funds.

Dr. Salinas diagnosed Adjustment Disorder with Mixed Anxiety and

Depressed Mood and Alcohol Abuse (Provisional).  Plaintiff's Global

Assessment of Functioning (GAF) current score was 56.[8]   *Id.*

   Dr. Salinas deemed Plaintiff's symptoms "to be associated with his

---

[8]  The ALJ afforded "little weight to" Plaintiff's GAF scores.  Tr. 30-31.  The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000) includes the GAF Scale that is primarily used by mental health practitioners.  The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *See* DSM-IV-TR 32-34.  The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale.  *Id.  See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing the GAF scale).  A score of 31-40 is defined as manifesting "[s]ome impairment in realty testing or communication (e.g., speech is at times illogical, obscure, or irrelevant)" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  DSM-IV-TR at 34.  A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning.  *Id.*  A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*  The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"  Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (unpublished) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).  In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.  In order to provide a global measure of disability, the WHO DSM-5 (see the chapter "Assessment Measures")."  DSM-5 at 16.

current life circumstances rather than representing a chronic mood disturbance" and found that "his emotional difficulties are not judged to significantly impact his daily adaptive functioning." *Id.*

The ALJ relied, in part, on Dr. Salinas' observations at step three of the sequential evaluation process, Tr. 24-26, and when assessing Plaintiff's RFC, Tr. 30.

*Samuel E. Ward, M.D., Consultative Examiner*

On March 4, 2013, at the Commissioner's request, Dr. Ward examined Plaintiff and completed a two-page examination report and a multi-page Medical Source Statement of Ability to do Work-Related Activities (Physical).  Tr. 359-71.  Dr. Ward stated in his examination notes that Plaintiff reported limited range of motion due to severe neck pain as a result of a motor vehicle accident in 2006, and that he was also unable to work due to pain.  Tr. 369.  Plaintiff's medications at the time included Fluoxetine, Gabapentin, Meloxicam, and Nortriptyline.  *Id.* Upon examination, Plaintiff's extremities were normal with the exception of the left shoulder and hand strength of 4/5.  His affect was normal and appropriate.  His motor strength was 5/5 proximal and distal upper and lower extremities, including his shoulders, except his left shoulder and hand strength were  4/5.  His gait was within normal limits and he did not

require assistive devices to walk or stand.  Tr. 369.  Dr. Ward noted that

Plaintiff could use his right hand to open doors and button his shirt without

difficulty, but "not with [his left] hand due to decreased sstrength [sic] and

numbness."  Tr. 370.  He was able to do heel and/toe walking and his

straight leg raise was within normal limits both supine and sitting; he had a

limited range of motion of the left leg lift at 20 degrees.  *Id*.  Dr. Ward

noted significantly reduced range of motion of the cervical spine, lumbar

spine, and left shoulder.  Otherwise, Plaintiff's range of motion was

within normal limits, including flexion with his right and left hands (joint

thumbs and fingers).  Tr. 360-62.  Dr. Ward diagnosed lumbago/low back

pain, cervicalgia, and benign hypertension.  Tr. 370.

In the Medical Source Statement, Dr. Ward opined (primarily by

checking boxes) that Plaintiff could lift and carry up to 20 pounds

occasionally, sit one hour at a time, stand 30 minutes at a time, and walk

30 minutes at a time.  He offered no opinion regarding the frequency of

Plaintiff's ability to lift and carry.  Tr. 363-64.  For an "8 hour work day,"

Dr. Ward opined, however, that Plaintiff could sit for a total of three hours,

stand for a total of two hours, and walk for a total of two hours – or seven

total hours of activity.  Tr. 364.  Dr. Ward noted that Plaintiff would need

to "lay down" for the remaining hour.  *Id.*  Dr. Ward further opined

(checked boxes) that Plaintiff was limited to occasional use (reaching overhead and "all other," handling, fingering, feeling, and push/pull) of the right hand, but could "never" use (same functions) the left hand for activities, and that Plaintiff was left-handed.  He could occasionally operate foot controls with his left and right feet.  Aside from what is stated in his two-page report, Tr. 369-70, Dr. Ward did not identify any particular medical or clinical findings supporting his opinion or explain his opinion.  Tr. 365.

Dr. Ward further opined (checked boxes) that Plaintiff could "occasionally" climb stairs and ramps, kneel and crawl, but could "never" climb ladders or scaffolds, balance, stoop, kneel, or crouch. Tr. 366.  Dr. Ward opined that Plaintiff had several environmental limitations such he could never tolerate unprotected heights, moving mechanical parts, extreme cold, and vibrations.  He could occasionally tolerate operating a motor vehicle, humidity and wetness, dust, odors, etc., and extreme heat.  He could tolerate quiet (library) and moderate (office) noise. Tr. 367.  In addition, Plaintiff was not able to perform activities like shopping, traveling without a companion for assistance, or sort, handle, and use paper/files, although he could perform other activities.  Tr. 368. Dr. Ward did not provide an opinion regarding whether any other work-related activities were affected by any impairments, or identify how the

activities were affected, and the medical opinions that would support this assessment.  He also opined that the limitations noted had lasted or will last for 12 consecutive months, although he left blank a question that asked whether he could form an opinion regarding the date when the limitations identified above were first present.  *Id.*  No written narrative was provided in the Medical Source Statement to support his opinions.  Tr. 363-68. Rather, Dr. Ward's written opinions are set forth with his examination notes discussed above.  Tr. 369-70.

The ALJ considered Dr. Ward's assessment at step three of the sequential evaluation process, Tr. 24, and when he assessed Plaintiff's RFC as follows:

> In March 2013, [Dr. Ward], a consultative examiner, diagnosed the claimant with back pain and indicated the claimant subjectively reported experiencing pain in his back and neck (Exhibit 8F).

> Although Dr. Ward's findings ultimately support a finding of "not disabled," the undersigned finds the claimant somewhat less limited based on the overall evidence received at the hearing level.  The undersigned notes that Dr. Ward's suggested limitations are not supported by his own examination.  Accordingly, the undersigned affords his assessment less than significant weight.  Detailed above and below, the undersigned fully accounted for Dr. Ward's suggested limitations that are supported by the record in forming the claimant's [RFC].  Dr. Ward did not have the benefit of reviewing all the evidence received at the hearing level prior to making his assessment.

Tr. 30.

*Veterans Administration*

Plaintiff received ongoing treatment at the N. Florida/S. Georgia Veterans Administration ("VA") facility between January 2, 2013, and on or about October 16, 2013.[9]  Tr. 372-515.

On January 25, 2013, Plaintiff established primary care with the VA. Tr. 492.  Patient records from Dr. Park were reviewed.  *Id.*  Upon examination, Plaintiff was cooperative, pleasant, and appropriate; oriented x4; no evidence of psychotic process; thoughts were logical, coherent, and linear; there was no evidence of hallucinations or delusions; and intellectual functioning was in the normal to high-normal range. Tr. 480-90; *see* Tr. 495 (psychiatric exam).   A PTSD diagnosis was suggested based on a self-report assessment; mild depression and marked to severe anxiety were noted.   A GAF score of 45 was assessed. *See supra* at n.8.  A trial of Prozac was prescribed.  Plaintiff reported that he had never attempted suicide, had no hospitalizations, and denied taking psychotropic drugs.  Tr. 482, 487, 489.  Diagnoses included chronic PTSD and depressive disorder, not otherwise specified, and alcohol abuse, such that Plaintiff drinks to relieve chronic pain.  Tr. 489.  The musculoskeletal exam revealed that Plaintiff's gait was coordinated and

---

[9]  The ALJ briefly referred to these patient notes.  Tr. 30.

smooth; no clubbing or cyanosis noted and no misalignment, defects or deformities of joints, bones and muscles.  Tr. 495.  Joints were within full range of motion with no pain or contractures.  *Id*.  It is further noted: "left deltoid appears to have atrophy and significant weakness and loss ROM. Passive ROM NL without CO."  *Id*.

On or about March 13, 2013, Plaintiff had surgery at Capital Regional Medical Center for interior cervical discectomy and fusion cervical at C4-C5, C5-C6, and C6-C7, with synthes plate, peek interbody spacers and ostocel allograft.  Tr. 455; *see* Tr. 517 and *supra* at 18.

In April 2013, Plaintiff informed his primary care provider at the VA that he had been doing well post-surgically until the past week, when he ran out of Oxycodone and had not been able to sleep.  Tr. 448.  Although his left arm range of motion and grip strength was equal to the right was better since surgery and he was able to perform rapid hand and finger to nose to thumb, he was "unable to elicit radial, brachial or elbow reflexes in the left."  Tr. 449-50.  His pain increased with increased motion of the shoulder and arm.  *Id*.  Plaintiff's dosage of Gabapentin was increased to 300 mg tid and Meloxicam was increased to 15 mg qd.  Tr. 451.  Plaintiff

also informed his therapist that he was still depressed,[10] not sleeping, was drinking, and "the pain meds he got here will not take care of his pain." Tr. 439. He agreed to additional therapy and treatment services. *Id*. On May 8, 2013, Plaintiff attended mental health classes and met with a substance abuse treatment team, including an addiction therapist. Tr. 426-37. Plaintiff continued with the classes in May through August 2013. Tr. 398-426.

On September 20, 2013, Plaintiff reported that he had daily pain in his neck, and that Gabapentin made him sleepy, while Lortab relieved the pain. Tr. 390. He had been out of Lortab for two weeks, however, and was "drinking beer for pain" and had "to sleep [be]cause of neck discomfort." *Id*. Plaintiff was noted to be "intolerant to gabapentin tid and tried pamalor per psych and Mobic." Tr. 392. Plaintiff was re-prescribed Mobic and Gabapentin, but to be taken at bedtime only, and referred to pain management. *Id.*

On September 23, 2013, Plaintiff reported that he was not able to tolerate Gabapentin, and that Pamalor and Mobic also did not help, and

---

[10] A September 20, 2013, psychiatry treatment note stated Plaintiff's diagnoses of PTSD, chronic; Depressive Disorder, NOS; Alcohol Dependence-Pain Disorder with Psychological Factors and a General Medical Condition. Tr. 389; *see* Tr. 724. Plaintiff also underwent substance abuse and general counseling at the VA, and was prescribed medications including Prozac for depression and Nortriptyline for chronic pain and insomnia. Tr. 399-417.

that he had been prescribed Lortab post-surgically.  Tr. 388.  For the last two weeks, Plaintiff was drinking two to three beers at night "to help with pain and go to sleep."  *Id.*  The pain management physician, Stephen A. Mudra, opined that "[t]here is no evidence to support using opioids beyond 16 weeks for non-cancer pain."  *Id.*  He further noted that Plaintiff's ongoing alcohol use "limits other therapies" such that he would not prescribe Tylenol or NSAIDs, and that "[i]n addition to [physical therapy], Topicals, tens, and gabapentim [sic] remain options." Tr. 389.  The following day, Plaintiff was instructed, however, to increase his Gabapentin dosage for improved pain management, and he was noted to have no side effects at the 300 mg dosage.  Tr. 387.  On October 16, 2013, Plaintiff received a TENS unit for pain, at which time he was noted to have 3/5 strength of the upper extremities.  Tr. 377-78.

    In records submitted to the Appeals Council, on October 29, 2013, Plaintiff reported having "shooting pain from his neck, over his left ear toward the temple area.  This is been a chronic problem but worse over the past week.  He states he 'overworked' last week-end doing manual labor and since has had worse pain.  Noticed a 'long' behind the ear which occurred also over the week-end.  He is rested in the area no longer swollen.  No irregularities noted on inspection/palpation today."  The nurse

noted that perhaps this was a muscle spasm due to chronic neck problems/overuse of muscles.  Tr. 711.  On October 30, 2013, Plaintiff reported for physical therapy evaluation and training.  Tr. 708.  The clinical impression was moderate neck and shoulder pain; self-limited ROM in the trunk and upper extremities; and reduced mobility.  Tr. 79.  On December 19, 2013, Plaintiff appeared for out-patient psychotherapy and medication management.  Tr. 690-707.  His problems with homelessness had been solved and he was now living rent-free as a caretaker of his aunt's property.  Tr. 692.  He reported that "things are going better," although he ran out of medications and did not know how to get them renewed.  Plaintiff reported reducing his alcohol consumption "about one beer per week!".  *Id.*  "Furthermore, before when he was taking the Prozac 40 MG, is not having nightmares!  Now that he is off meds, he reports and incidents of one god."  *Id.*  Plaintiff had a negative screen for depression, but a positive PTSD screening test.  Plaintiff had an optional depression screening performed and received a score of nine which was suggestive of mild depression.  Tr. 694.  A psychologist diagnosed Plaintiff with PTSD, chronic, depression, not otherwise specified, and alcohol dependence and assigned Plaintiff a GAF score of 60.  Tr. 702-03; *see supra* at n.8.

On March 26 and April 30, 2014, Plaintiff followed-up with the VA for psychiatric and medication management.  Tr. 664-78.  On June 4, July 7, and September 10, 2014, Plaintiff was seen and assessed by Telehealth. Diagnostic impressions included: "Unspecified Anxiety Do, Unspecified Depressive, do, r/o GAD, Alcohol use do, Tobacco Use Disorder, PTSD by hx," Tr. 626.  Tr. 626-61.

Plaintiff was noted to have continuing neck pain in September 2014.  Tr. 556.  (A few of these patient records appear elsewhere in the record.  *E.g., compare* Tr. 377-378 *with* Tr. 713-23.)  A September 30, 2014, cervical spine MRI indicated "[m]ultilevel degenerative findings" including "moderate right and moderate to severe left foraminal narrowing" at C3-C4, "moderate" right foraminal narrowing at C4-C5, "moderate" bilateral foraminal narrowing at C5-C6 and C6-C7, in addition to the anterior fusion at C4-C7.  Tr. 558.  An August 26, 2014, lumbar spine MRI indicated "multilevel degenerative findings [] with only mild foraminal narrowing at the L4-L5 and L5-S1 levels."  Tr. 560.  On October 28, 2014, Plaintiff reported that he wanted to go back to work, but could not due to pain.  Tr. 574.  Gregory J. Murad, M.D., neurosurgery contract physician with the VA, did not recommend further surgical intervention because Plaintiff was "neurologically intact and has no signs of myelopathy.  I think

that he would benefit from conservative treatment.  This includes but is not limited to Physical therapy, chiropractic, massage therapy, acupuncture, and pain management (both medical and interventional)."  Tr. 575.  On November 2014, Plaintiff continued, however, to report that Gabapentin was not providing relief, he was not sleeping, and his depression was worsening.  Plaintiff was drinking two or three beers every other day to help with pain.  Plaintiff reported that because of the pain "he easily gets frustrated and irritated…and also reports feeling anxious easily because he worries about the pain and how it can affect his overall functioning."  He was smoking les and started smoking education classes.  Tr. 610, 613.

*Non-Examining Medical Source Opinions*

In June 2012, non-examining psychologists Mercedes DeCubas, Ph.D., and Pauline Hightower, Psy.D., opined that Plaintiff's mental impairments were not severe.  Tr. 94, 108.

The ALJ referred to the opinions of Drs. DeCubas and Hightower when he assessed Plaintiff's RFC.  Tr. 31-32.  The ALJ noted that the doctors were acceptable medical sources, but that their opinions did not carry the same weight as examining or treating physicians.  Nevertheless, he afforded their assessments "significant weight" and that he "fully accounted for" their suggested limitations that were supported by the

record in forming Plaintiff's RFC.  Tr. 31.

In July 2012, non-examining physician David Guttman, M.D., opined that Plaintiff's was capable of light exertional activity with occasional postural limitations and no manipulative, visual, communicative, and environmental limitations.  Tr. 110-11.  The ALJ found Plaintiff "somewhat more limited based on the overall evidence received at the hearing level" and afforded "his opinions some weight.  Detailed above and below, the undersigned has fully accounted for Dr. Guttman's suggested limitations that are supported by the record in forming the claimant's [RFC].  Dr. Guttman did not have the benefit of reviewing all the evidence received at the hearing level prior to making his assessment."  Tr. 32.  (The ALJ provided a similar assessment ("finding Plaintiff "somewhat more limited" and affording his opinion "some weight") regarding Dr. Siano's December 2011 report.  Tr. 29.)  The ALJ does not expressly state how he fully accounted for Dr. Guttman's suggested limitations.

### B.  Testimony[11]

*Plaintiff's Statements*

In a May 7, 2012, supplemental pain questionnaire, Plaintiff reported taking 300 mg of Gabapentin, but that it made him sleepy and he was not sure if it was effective for pain relief.  Tr. 268.  He used a microwave to cook or his mother cooked his meals; he can take care of his personal care.  *Id.*  He cannot cook at the stove when using his medication because he "may fall asleep."  *Id.*  His mother also helped him shop, and it took him "all day" to clean.  *Id.*  Plaintiff did any yard work "a little bit at a time."  Tr. 269.  Plaintiff stated that he could sit and stand "only for short periods" and could walk only a "short distance".  *Id.*  In a phone call with an SSA employee the same month, Plaintiff reportedly stated that he could do "light household chores such as sweeping the floor, washing dishes, and folding laundry, but he has to take frequent breaks.  He wipes down the walls… once a week but can only work 10-15 mins at a time and it takes him all day to get it done."  Tr. 282.  His mother drove him if he needed to go anywhere, and she also "prepares

---

[11]  The ALJ referred to Plaintiff's pre-hearing statements (function and disability reports) and hearing testimony at step three, Tr. 24-26, and when assessing Plaintiff's RFC, Tr. 28-29, 32.  The ALJ also considered the pre-hearing statements of Plaintiff's mother.  Tr. 32.  The ALJ stated he reviewed this information in light of the medical evidence.  Tr. 24-32.

meals for him that last about 2 days.  He mainly uses the microwave to prepare meals."  *Id.*  Plaintiff also reportedly could walk three blocks, lift 40 pounds, and sit for 10 minutes. *Id.*  In June 2013, Plaintiff reportedly informed an SSA employee that he could take care of his own hygiene, prepare "simple meals," do laundry, make purchases in a store, and drive, although he "has to move slower and avoid certain positions due to pain."  Tr.  290.

At the December 16, 2013, hearing, Plaintiff stated that he was 50 years old, completed high school, was six feet tall, and weighed 138 pounds.  He is left-handed and last worked in 2010, except for a few days of work in 2011 as a part-time dishwasher before his surgery.  Tr. 46-48. He lost the job, however, because he was not working quickly enough. Tr. 48.  Plaintiff lives alone in a house owned by his cousin.  Tr. 57.  He did not pay rent at this time.  *Id.*  His 68-year-old mother cleans because his efforts are not satisfactory to her.  *Id.*  He uses the microwave for cooking and does his own laundry.  *Id.*  He does not own or drive a car, except for when he drives his mother's car to the store, a short distance, ten minutes away.  Tr. 57-58.  He has no income, but relies on food stamps.  Tr. 58.

In 2010, Plaintiff worked as a part-time nighttime monitor or

security guard for six months.  Tr. 48-49.  Previously he worked as a laborer on construction sites, sometimes lifting and carrying more than 100 pounds.  Tr. 49.  He also worked part-time as a janitor for about three months and as a warehouse worker, loading and unloading lifting more than 100 pounds.  Tr. 50.

Plaintiff received medical care through Vocational Rehabilitation providers and also through the VA.  Tr. 52.  He went to Vocational Rehabilitation to determine if he could return to work, and was "still listed with them."  Tr. 52-53.  He had not yet been placed, however, in a retraining program.  Tr. 53.  At the time of the hearing, he was not receiving treatment for his neck or lower back at the VA.  Tr. 59.  He receives non-narcotic pain medication (Gabapentin) from the VA. Tr. 59-60.

Regarding his March 2013 back surgery, some of his symptoms were relieved at first; however, his neck, shoulder, and back pain continued.  Tr. 51.  He also continued to have difficulty raising his left shoulder or lifting heavy weights with the left side.  *Id.*  After his surgery in March 2013, he followed up with TOC until he was released in August 2013.  Tr. 52.  As noted above, Plaintiff was prescribed Gabapentin for pain, however, "it really doesn't work."  Tr. 60.  He continued to take it at

his doctor's instructions and because they told him it could take several weeks to work.  *Id.*  He had been taking the medication for a couple of months and the dosage was recently increased.  *Id.*

Plaintiff reported that his pain was as bad at that time as it was in August 2013, when he last saw Dr. Park;[12] however, he explained that "the people at the V.A., they don't believe in giving anyone really narcotics.  So they tell you that you have to work with the pain."  Tr. 62. Plaintiff was provided with a TENS machine from VA physical therapy services, and uses it for pain three to four times a day.  Tr. 63. Otherwise, he will "just lay down and try to be still" to alleviate his pain. *Id.*  His most comfortable position during the day to get relief from the pain" was "[l]aying on my side."  Tr. 64.  He also continues to have depression despite medication, noting that the medication "helps at the beginning" and then the dosage has to be increased.  Tr. 55-56.

Plaintiff testified that "can't really raise [his] shoulder, or lift any heavyweights on [his] left side."  He can raise his left arm probably shoulder length and can brush his hair with his left arm for a few minutes and then his "whole left side will go numb."  Tr. 53.  He could lift up to a gallon of milk, or

---

[12]  Dr. Parks told him "that technically there wasn't too much more he could do to [his] back."  Tr. 64.

no more than ten pounds, with his left arm, and possibly could lift 20 pounds with his right.  Tr. 54.  He could walk up to 20 minutes before having to rest due to neck pain and headache, stand in one place for 30 minutes, and sit for 45 minutes before having to get up and move around. Tr. 54-55.

Plaintiff also had difficulty gripping and grasping with his left hand due to numbness and weak grip.  Tr. 56.  It was difficult for him to get a grip on small objects like paper clips, and he has had that problem since before his neck surgery. *Id.*  He could use his left hand and arm for up to 15 minutes before experiencing numbness, and then would have to wait 40 minutes before using it again.  Tr. 65.  With continued use, the breaks from use would get longer.  *Id.*  His pain generally increased with activity.  Tr. 61.

Regarding his daily activities, Plaintiff testified that he lives alone but his mother helps clean.  Tr. 57.  He wipes down the walls, uses the microwave to cook, does laundry, and rarely drives ten minutes to the store.  Tr. 58.  He is unable to drive for longer distances due to difficulty sitting. *Id.*

Plaintiff acknowledged having some issues with alcohol in the past but was not drinking much, maybe a beer every other day.  He is

receiving treatment for depression at the VA and taking medication, which

helped at the beginning and then the amount (mgs) was increased with

the last increase four months ago.  Tr. 55.

*Vocational Expert Testimony*[13]

At the December 16, 2013, hearing, the ALJ asked the VE a

hypothetical question "based on 5A [Tr. 102-14]"[14] and

> to assume a hypothetical individual with age; education; and past
> work experience of this claimant; who could occasionally lift 20
> pounds; frequently lift 10 pounds; who can stand and walk for six-
> hours out of an eight-hour day; and sit for six-hours out of an eight-
> hour day; who could occasionally stoop; crouch; kneel; crawl; and
> climb.  Could such an individual perform any of the claimant's past
> work?

The VE stated "[n]o, your honor, due to the exertion level."  Tr. 66-67.  The

hypothetical question referred to an RFC with a light exertion level,

whereas some of Plaintiff's past work included work as a janitor,

warehouse worker, or laborer on a construction site and each required him

to lift more than 50 and 100 pounds, which had a medium or heavy

exertion level.  Tr. 48-50, 66.  The VE listed three other jobs at the light

---

[13]  The ALJ implicitly relied on the VE's testimony at step four when he
determined that Plaintiff was unable to perform any of his past relevant work and
expressly at step five when he determined that Plaintiff was able to perform three
representative jobs.  Tr. 33; *see supra* at 4-5, ¶ 8.

[14]  Exhibit 5A is a Disability Determination Explanation for the DIB claim at the
reconsideration level performed by Drs. Hightower and Guttman.  Tr. 102-14.

exertional level that would be available, such as laundry sorter, ticket

clerk, and assembler, all light exertion with an SVP of two. *Id.*; *see supra* at

n.1.

     The ALJ asked the VE to assume a second hypothetical individual

with the following limitations, ultimately adopted as the majority of the RFC

assessment:

> [O]cassionally lift 10 pounds; *frequently lift five pounds*;
> stands and walks for six-hours out of an eight-hour day; and
> sit for six-hours out of an eight-hour day; occasionally
> balance; stoop; crouch; kneel; crawl; and climb; no climbing
> of ladders; ropes; or scaffolds []; frequently reach with the
> dominant left upper extremity; that would be reaching in all
> directions; frequent handling and fingering with the left upper
> extremity; avoid concentrated exposure to vibrations.

Tr. 67-68 (emphasis added); *Cf.* Tr. 27 (RFC assessment).   The VE

testified that the individual *could not* perform the Plaintiff's past work or

the jobs previously listed, *i.e.,* laundry sorter, ticket clerk, and assembler,

because the hypothetical question "*would be sedentary*" and the jobs

listed were at the light exertional level.   Tr. 68 (emphasis added).   (In

part, "[l]ight work involves lifting no more than 20 pounds at a time with

frequent lifting or carrying objects weighing up to 10 pounds."  20 C.F.R.

§ 404.1567(b).  In part, "[s]edentary work involves lifting no more than 10

pounds at a time and occasionally lifting or carrying articles like docket

files, ledges, and small tools."  20 C.F.R. § 404.1567(a).)  The ALJ stated,

however:

> Social Security says that light work involves lifting no more than 20
> pounds at a time with frequent lifting or carrying of objects weighing
> up to 10 pounds?  Even though the weight lifted may be very little,
> jobs in this category wouldn't require is a good deal [sic] of walking,
> or standing, or when it involves sitting most of the time with some
> pushing and pulling of arms and leg controls?  Did we consider
> capable of performing a full-range -- full- or wide-range of light work,
> you must have the ability to do substantially all of these activities?  *So
> if we have somebody who can occasionally lift 10 pounds, or
> frequently lift five, which Social Security -- that correspond to even
> though the weight lifting may be very little, a job is in this light
> category requires a good deal of walking or standing.  And standing
> would be six.  And sitting would six -- would be six.  So Social
> Security seems to indicate that might be considered light work*?
> What's your professional opinion?

Tr. 68-69 (emphasis added).  The VE responded: "Well there basically,

your honor, looks like is--able to--ability to walk and stand for six-hours."

Tr. 69.  The ALJ stated, "Yes, I think so.  Let me ask you this?  Are there

light jobs that an individual with those limitations could perform?"  *Id.*  The

VE cited jobs as a house sitter, mail sorter, and ticket clerk, all light

exertion with an SVP of two.  *Id.; see supra* at n.1.  At this time in the

hearing, the VE stated that his testimony was consistent with the DOT and

related documents.  Tr. 69.

The VE was questioned further by Plaintiff's attorney and believed

that the jobs (other than assembler that was suggested in response to the

first hypothetical question) cited for the second hypothetical question

could be performed even if the individual was limited to "occasional use of their dominant hand."  Tr. 70.  With "less than occasional use," the number of jobs available for each type of job description would be reduced by half, although the VE stated he was "not sure.  I would have to look them all up."  Tr. 70-71, 73.  He clarified that it "would not rule all the jobs out," although "it would probably cut the numbers listed by 50 percent."  Tr. 73.  Although somewhat unclear, the VE further thought (based on the ALJ's clarification of a question posed by Plaintiff's counsel) that with a limitation of "up to a third of the day" to the dominant left hand, which was less than occasional (up to 33%, Tr. 365), the house sitter job could still be performed.  Tr. 72-73.  Being off-task 20 percent of the day or missing at least two days a month on a consistent basis would eliminate all jobs.  Tr. 74.

At step five, based on the VE's opinion, the ALJ determined that Plaintiff was capable of performing three representative occupations such as house sitter, mail sorter, and ticket clerk, all with light exertion and an SVP of two.  Tr.33.

## V.  Legal Analysis

### Substantial evidence does not support the ALJ's RFC and Step Five assessments.

Plaintiff argues that substantial evidence does not support the ALJ's

RFC determination.  EFC No. 18 at 21-25.

The ALJ determined that Plaintiff had the RFC to perform light work

as defined in 20 C.F.R. § 404.1567(b) as follows:

> such that he can occasionally lift 10 pounds and frequently lift 5 pounds.  He can stand and/or walk 6-hours in an 8-hour workday and sit for 6-hours in an 8-hour workday.  He can occasionally climb ramps, stairs, balance, kneel, crouch, stoop, and/or crawl.  He cannot climb ladders, ropes, or scaffolds.  He can frequently reach with his left upper extremity.  He can frequently handle and finger with his left hand.  He should avoid concentrated exposure to vibrations.

Tr. 27.  By definition, in part, "[l]ight work involves lifting no more than 20

pounds at a time with frequent lifting or carrying objects weighing up to 10

pounds."[15]  20 C.F.R. § 404.1567(b).  In part, "[s]edentary work involves

---

[15]  According to the DOT:

**L-Light Work** - Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work.  Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.  NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and

lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledges, and small tools."  20 C.F.R. § 404.1567(a).)

In determining Plaintiff's RFC, the ALJ began his discussion with consideration of statements made by Plaintiff and others to the SSA, Plaintiff's statements to health care providers, and Plaintiff's hearing testimony.  Tr. 28-29.

In December 2011, Dr. Siano, a consultative examiner, diagnosed Plaintiff with back pain.  His findings were generally normal.  The ALJ afforded his assessment "only some weight" and found Plaintiff "somewhat more limited."  Tr. 29.

In June 2012, Drs. DeCubas and Hightower, non-examining medical sources, determined that Plaintiff had no restriction in activities of daily living, mild difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, and no episodes of decompensation, each of extended duration.  Tr. 31.  The ALJ afforded their assessments "significant weight."  *Id.*

---

is physically demanding of a worker even though the amount of force exerted is negligible.

DOT (4th Ed., Rev. 1991), Appendix C: Components of the Definition Trailer, at § IV Physical Demands-Strength Rating (Strength).

The ALJ considered a May 2012, report from Dr. Salinas, a consultative examiner, who opined "that the claimant's emotional difficulties do not significantly impact the claimant's adaptive functioning." Tr. 30.  The ALJ gave Dr. Salinas's opinion "only some weight" and also found Plaintiff "somewhat less limited."  *Id.*

In July 2012, Dr. Guttman, a non-examining, medical source, like Dr. Siano, reported generally normal findings regarding Plaintiff's physical condition.  Tr. 32.  The ALJ considered Dr. Guttman's findings, but found Plaintiff "somewhat more limited" and afforded his opinions "some weight." *Id.*

The ALJ considered Plaintiff's diagnosis and treatment at TOC between March 2012 and September 2013, and noted, in part, "that physicians consistently characterize the claimant's final conditions is mild to moderate when relating the claimant's MRI results" and that "x-ray scans of the claimant cervical spine subsequent to the claimant spinal fusion revealed stable hardware and no evidence of subsidence."  Tr. 29. The ALJ also referred to Dr. Rodriguez's notes (between April 2012 and October 2012) indicating "the claimant subjectively reported experiencing pain and intermittent numbness in his lower back."  Tr. 30.

The ALJ also considered the diagnoses of physicians at the

Marianna VA Outpatient Clinic between January 2013 and August 2013. They diagnosed Plaintiff "with degenerative disc disease of the lumbar and cervical spine and indicated the claimant had a history of neck and back pain." A history of spinal fusion and that Plaintiff was maintained on Gabapentin (non-narcotic) and Trazodone for pain was noted. Tr. 30.

The ALJ referred to Dr. Ward's (a consultative examiner) March 2013 diagnosis of Plaintiff "with back pain and indicated the claimant subjectively reported experiencing pain in his back and neck." Tr. 30. The ALJ did not discuss any other findings from Dr. Ward. *Id*. The ALJ found Plaintiff "somewhat less limited" and further noted "that Dr. Ward suggested limitations are not supported by his own examination" and afforded "his assessment less than significant weight." *Id*. Dr. Ward's findings and opinions are set forth herein at pages 21 through 24. Although a one-time examiner, Dr. Ward's assessments are the most recent opinions regarding Plaintiff's functional abilities.

"[S]ome issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case, i.e., that would direct the determination or decision of disability. The following are examples of such issues: . . . 2. What an individual's RFC is." SSR 96-5p, 1996 SSR LEXIS 2, at *5 (July

2, 1996).  Social Security Ruling 96-5p provides further guidance regarding

the RFC assessments and medical source statements:

> The regulations describe two distinct kinds of assessments of what
> an individual can do despite the presence of a severe impairment(s).
> The first is described in 20 CFR 404.1513(b) and (c) and 416.913(b)
> and (c) as a "statement about what you can still do despite your
> impairment(s)" made by an individual's medical source and based on
> that source's own medical findings.  This "medical source statement"
> is an opinion submitted by a medical source as part of a medical
> report.  The second category of assessments is the RFC assessment
> described in 20 CFR 404.1545, 404.1546, 416.945, and 416.946
> which is the adjudicator's ultimate finding of "what you can still do
> despite your limitations."  Even though the adjudicator's RFC
> assessment may adopt the opinions in a medical source statement,
> they are not the same thing: A medical source statement is evidence
> that is submitted to SSA by an individual's medical source reflecting
> the source's opinion based on his or her own knowledge, while an
> RFC assessment is the adjudicator's ultimate finding based on a
> consideration of this opinion and all the other evidence in the case
> record about what an individual can do despite his or her
> impairment(s).

1996 SSR LEXIS 2, at *10-11.

The ALJ considers and weighs patient notes of treating physicians,

the opinions of examining and non-agency agency medical sources, and

other evidence in the record, including the claimant's statements, when

fashioning an RFC assessment.  *See* 20 C.F.R. § 404.1527; Fries v.

Comm'r of Soc. Sec., 196 F. App'x 827, 833 (11th Cir. 2006) (unpublished)

(allowing ALJ to rely on non-examining physician opinions when consistent

with record).  The ALJ was permitted to give more weight to the opinions of

some medical sources over others to the extent they are supported by the record.

The burden is on the claimant to prove that she is disabled.  Bell v. Bowen, 796 F.2d 1350, 1352 (11th Cir. 1986) (citing 20 C.F.R. §§ 404.1525, 404.1526); Wilkinson v. Bowen, 847 F.2d 660, 663 (11th Cir. 1987).  This Court's "limited review precludes deciding the facts anew, making credibility determinations, or reweighing the evidence."  Moore, 405 F.3d at 1211 (citing Bloodsworth, 703 F.2d at 1239).  In determining the RFC, the ALJ must, however, "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  SSR 96-8p, 1996 SSR LEXIS 5, at *19 (July 2, 1996).

The ALJ partially credited Dr. Ward's opinion when he made his RFC assessment.  The ALJ did not state, however, why certain portions of Dr. Ward's opinions were adopted, but others rejected.  For example, Dr. Ward opined that Plaintiff could never reach, handle, finger, feel, or push/pull with his left hand, his dominant hand.  Tr. 365.  The ALJ determined that Plaintiff "can frequently handle and finger with his left hand."  Tr. 27.  The ALJ does not explain the rationale for this assessment.  (It is noted that Dr. Ward opined that Plaintiff's range of

motion for his hands is within normal limits (wnl).  Tr. 361.)  Dr. Ward

noted in his examination report that Plaintiff's extremities were normal with

the exception of the left shoulder and hand strength of 4/5.  Tr. 369.

Although Plaintiff could use his right hand to open doors and use buttons,

but "not with [left] hand due to decreased strength and numbness."

Tr. 370.  Dr. Ward also noted limited range of motion of the left leg at 20

degrees.  *Id.*  Dr. Ward also noted that Plaintiff had significantly reduced

range of motion of the cervical spine, lumbar spine, and left shoulder.

Tr. 360.

Furthermore, although Dr. Ward was not provided with medical

evidence to review in conjunction with his examination, the signs of

limitations with a duration over a year are consistent with Dr. Park's

treatment records indicating severe pain and limitations and the MRI

results demonstrated significant underlying pathology.  *See, e.g.*, Tr. 330-

36, 339-42, 347, 533-37, 541 (Dr. Park's records and MRI results).

Moreover, less than two weeks after Dr. Ward's evaluation (March 13,

2013), Plaintiff underwent a cervical spine fusion, with a postoperative

diagnosis of cervical degenerative disc disease with radiculopathy at C4-

C5, C5-C6, and C6-C7.[16]  Tr. 517.  (Plaintiff's alleged onset date was

March 30, 2012.)

As noted herein, the ALJ accorded "only some weight" to the opinions

of Drs. Siano (December 2011) and Guttman (July 2012) and "less than

significant weight" to Dr. Ward's opinions (March 2013), and found Plaintiff

was "somewhat less limited" as indicated by Dr. Ward, but "somewhat more

limited" as indicated by Drs. Guttman and Siano, all without expressly

stating the reasons for his assessment of their opinions.  Tr. 30, 32.

Although the Court has reviewed the entire record in this case and can

piece together the evidence as to why the ALJ reached his conclusions

regarding their opinions, it is not for the Court to provide the reasons for the

ALJ's assessments of their opinions.[17]

---

[16]  On May 7, 2013, Plaintiff followed up with TOC complaining of some
continuing neck pain; radiculopathy improved.  Tr. 528.  A bilateral cervical spine
examination noted, in part, that Plaintiff "is neurovascular only intact and moves all
extremities well.  There is no evidence of Horner's syndrome.  The speech is normal
without hoarseness.  Normal gait and station."  *Id.*  An August 8, 2013, patient note from
TOC notes that Plaintiff reported his symptoms worsened since the last visit; the pain is
constant; pain is moderate-to-severe with a rating of 7/10.  Tr. 526.  The bilateral
cervical spine examination noted revealed, in part, that Plaintiff's range of motion was
moderately limited with discomfort; normal gait and station; the remainder of the
musculoskeletal exam does not reveal any significant abnormalities.  The impression
included "[o]ther orthopedic aftercare Bilateral fusion solid with chronic neck pain."
Tr. 527.  Plaintiff was to report his primary physician should he need further pain
medications; a course of physical therapy was recommended; Norco was prescribed;
and Plaintiff was instructed to return if pain or symptoms arose.  *Id.*

[17]  The ALJ must "state specifically the weight according to each item of evidence
and why he makes that decision."  Cowart v. Schweiker, 662 F.2d at 735.  Further, it is
not the task of the Court to re-weigh the evidence.  *See generally* Romanzi v. Comm'r of

The problem here is exacerbated because the ALJ's RFC determination does not clearly support the ALJ's conclusion at step five of the sequential evaluation process that Plaintiff is capable of performing one of three representative occupations identified by the VE jobs such as house sitter, mail sorter, and ticket clerk, which are light exertion with an SVP of two or unskilled.

The ALJ determined that Plaintiff has the RFC to perform a reduced range of light work, not a full range of light work.  Tr. 27, 32.  At step five, the ALJ stated that Plaintiff's "ability to perform all or substantially all the requirements of this level of work has been impeded by additional limitations," and, as a result, the ALJ consulted with a VE to determine the extent to which these limitations eroded the unskilled light occupational base.  *Id.*

At the December 16, 2013, hearing, the ALJ asked the VE a question that included consideration of the hypothetical individual occasionally lifting 20 pounds and frequently lifting ten pounds.  Tr. 66-67.  The VE opined that Plaintiff could not perform his past work "due to the exertion level."  Tr. 67.  The question referred to an RFC with a light exertion level, whereas some

---

Soc. Sec., Case No. 6:07cv1848-Orl-DAB, 2009 U.S. Dist. LEXIS 78, at *14 (M.D. Fla. Jan. 5, 2009), *appeal after remand*, Romanzi v. Comm'r of Soc. Sec., Case No. 6:10cv484-Orl-DAB, 2011 U.S. Dist. LEXIS 98661 (M.D. Fla. Aug. 31, 2011).

of Plaintiff's past work included work as a janitor, warehouse worker, or

laborer on a construction site and each required him to lift more than 50

and 100 pounds, which had a medium or heavy exertion level.  Tr. 48-50,

66.  Notwithstanding, the VE opined that the hypothetical individual could

perform several jobs such as laundry sorter, ticket clerk, and assembler, all

with light exertion with an SVP of two.  Tr. 67.

The ALJ asked the VE a second hypothetical question that included

consideration of an individual who could occasionally lift ten pounds and

frequently lift five pounds.  Tr. 67-68; *see supra* at 39.  The VE testified

that the individual *could not* perform the Plaintiff's past work or the jobs

previously listed, *i.e.,* laundry sorter, ticket clerk, and assembler, because

the hypothetical question "*would be sedentary*" and the jobs listed were

at the light exertional level.  Tr. 68 (emphasis added).  The ALJ stated,

however:

> Social Security says that light work involves lifting no more than 20
> pounds at a time with frequent lifting or carrying of objects weighing
> up to 10 pounds?  Even though the weight lifted may be very little,
> jobs in this category wouldn't require is a good deal [sic] of walking,
> or standing, or when it involves sitting most of the time with some
> pushing and pulling of arms and leg controls?  Did we consider
> capable of performing a full-range -- full- or wide-range of light work,
> you must have the ability to do substantially all of these activities?  *So
> if we have somebody who can occasionally lift 10 pounds, or
> frequently lift five, which Social Security -- that correspond to even
> though the weight lifting may be very little, a job is in this light
> category requires a good deal of walking or standing.  And standing*

*would be six.  And sitting would six -- would be six.  So Social Security seems to indicate that might be considered light work*? What's your professional opinion?

Tr. 68-69 (emphasis added).  The VE responded: "Well there basically, your honor, looks like is--able to--ability to walk and stand for six-hours." Tr. 69.  The ALJ stated, "Yes, I think so.  Let me ask you this?  Are there light jobs that an individual with those limitations could perform?"  *Id.*  The VE cited light exertional jobs as a house sitter, mail sorter, and ticket clerk (previously mentioned by the VE), all light exertion with an SVP of two. *Id.; see supra* at n. 1.  At this time in the hearing, the VE stated that his testimony was consistent with the DOT and related documents.  Tr. 69.

The VE was questioned further by Plaintiff's attorney and the VE believed that the jobs (other than assembler that was suggested in response to the first hypothetical question) cited for the second hypothetical question could be performed even if the individual was limited to "occasional use of their dominant hand."  Tr. 70.  With "less than occasional use," the number of jobs available for each type of job description would be reduced by half, although the VE stated he was "not sure.  I would have to look them all up."  Tr. 70-71, 73.  He clarified that it "would not rule all the jobs out."  Tr. 73.  Although somewhat unclear, the VE further thought (based on the ALJ's clarification of a question posed by

Plaintiff's counsel) that with a limitation of "up to a third of the day" to the dominant left hand, which was less than occasional (up to 33%, Tr. 365), the *house sitter* job could still be performed.[18]  Tr. 72-73.

The house sitter job is performed as light not sedentary.  Tr. 33. There is no testimony from the VE that Plaintiff could perform this job or that of mail sorter or ticket clerk if restricted to frequently lifting five pounds. Light work involves lifting nor more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  This would exceed the weight limit imposed by the ALJ's RFC determination and hypothetical questions posed to the VE that Plaintiff can frequently lift not more than five pounds and ten pounds occasionally.  Tr. 27.

After posing the question to the VE, which included the five pound lifting restriction, Tr. 68-69, the VE seemed to focus on Plaintiff's ability to walk and stand for six hours and then concluded that Plaintiff could perform three representative jobs at the light exertion level, *i.e.*, house sitter, mail sorter, and ticket clerk, without any discussion of the lifting/carrying

---

[18]  The ALJ determined that Plaintiff "can frequently handle and finger with his left hand," whereas Dr. Ward opined that Plaintiff could never reach, handle, finger, feel or push and pull with his left hand.  Tr. 365.  Dr. Ward also opined that Plaintiff could occasionally lift and carry 20 pounds, but did not opine whether he could frequently lift any weight.  Tr. 363.  "Occasionally" means: "activity or condition exists up to 1/3 of the time."  DOT (4th Ed., Rev. 1991), Appendix C: Components of the Definition Trailer, at § IV Physical Demands-Strength Rating.  "Frequently" means: "activity or condition exists from 1/3 to 2/3 of the time."  *Id.  See* Tr. 363.

component of light versus sedentary work.  Tr. 69.

Based upon the foregoing, the Court concludes that the ALJ's RFC assessment is not supported by substantial evidence and further that the ALJ's assessment at step five is based on a dialogue between the ALJ and VE that produced, at best, responses from the VE that were unclear.  This case should be remanded to the Commissioner for further proceedings so that the ALJ can explain his rationale for weighing the medical source opinions and clarify the bases for his RFC and step five assessments, which may require testimony of a VE.[19]

## VI.  Conclusion

Considering the record as a whole, the findings of the ALJ are not based upon substantial evidence in the record and the ALJ did not correctly apply the law.  Accordingly, pursuant to the fourth sentence in 42 U.S.C. § 405(g), it is respectfully recommended that the decision of the Commissioner to deny Plaintiff's applications for Social Security benefits be

---

[19]  In light of the resolution of this issue, it is not necessary to consider Plaintiff's second argument that the ALJ's credibility determination is unsupported by substantial evidence and a subsidiary argument that the Appeals Council erred in denying the Plaintiff's request for review of the ALJ's decision based on new and material evidence. ECF No. 18 at 25-31.  *See* Roark v. Comm'r of Soc. Sec., Case No. 6:14-cv-Orl-37TBS, 2015 U.S. Dist. LEXIS 34996, at *14 (M.D. Fla. Jan. 29, 2015) (citations omitted), *adopted*, 2015 U.S. Dist. LEXIS 35004, at *2-3 (M.D. Fla. Mar. 20, 2015).  No opinion is rendered whether Plaintiff is disabled or entitled to benefits.

**REVERSED** and this case be **REMANDED** for further proceedings.

**IN CHAMBERS** at Tallahassee, Florida, on April 22, 2016.

> s/ Charles A. Stampelos
> **CHARLES A. STAMPELOS**
> **UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.